## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **8:09CR84** |
| vs. | ) | |
| | ) | **REPORT AND** |
| SHANE BERTUCCI, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

An evidentiary hearing was conducted on July 17 (Transcript, Filing 35) and September 29, 2009 (Transcript, Filing 44) on the defendant's Motion to Dismiss (Filing 23). The final post-hearing brief was filed on October 27, 2009, at which time the motion was deemed submitted.

The defendant, Shane Bertucci, is a member of the Omaha Tribe and is a member of the Native American Church. He is charged with three counts of killing a bald eagle, in violation of the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668(a) (the "Eagle Act"). The Eagle Act criminalizes taking protected birds (or possessing them, dead or alive) without a permit. Bertucci contends the charges should be dismissed because the enforcement of § 668(a) violates his right to free exercise of religion under the First Amendment of the United States Constitution and the Religious Freedom Restoration Act (RFRA). Under the RFRA, the government is forbidden to substantially burden an individual's free exercise of religion unless it shows a compelling interest and that the means employed are the least restrictive means available.

For the reasons discussed herein, I recommend that the motion be denied.

## I. BURDEN AND ORDER OF PROOF

Under the RFRA, the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a); however, the government may impose such a burden "only if it demonstrates that application of the burden ... is in furtherance of a compelling governmental interest; and ... is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.§ 2000bb-1(b).

Once a defendant shows that applying a statute to him will substantially burden his religion, the government must justify the burden by establishing a sufficiently compelling interest and showing that it could not accommodate religion more without serving that interest less. *United States v. Friday*, 525 F.3d 938, 946 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1312 (2009) (citing 42 U.S.C. § 2000bb-1; *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006).[1]

Both prongs of RFRA's strict scrutiny test are questions of law. *United States v. Friday*, 525 F.3d at 949 (citing, *inter alia*, *Christians v. Crystal Evangelical Free Church (In re Young),* 82 F.3d 1407, 1419 (8th Cir. 1996), *vacated & remanded,* 521 U.S. 1114 (1997) (mem.), *reinstated in relevant part,* 141 F.3d 854, 856 (8th Cir. 1998)).

---

[1]In *United States v. Oliver*, 255 F.3d 588, 589 (8th Cir. 2001), the Court of Appeals held that the that "the magistrate and the district court correctly applied the test set forth in RFRA and reached the appropriate conclusion that the government had met its burden."  The district court decision, *United States v. Oliver*, 2000 WL 34030990, No. CR99-0010 (N.D. Iowa, Mar. 9, 2000), was not published and the Court of Appeals did not restate the test in its published opinion.  Under the circumstances, I have applied the analysis set out in *United States v. Friday*, 525 F.3d 938, 946 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1312 (2009), because it incorporates the more recent summary of the "compelling interest" test from *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006), a decision which is binding on this court.

-2-

## II.  EVIDENCE

### A.  Defendant's Evidence

**1.  Testimony of Rodney Morris** (Filing 35, pp. 6-43)

Rodney Morris testified that he is a member of the Omaha Tribe and an elected member of the tribal council.  As a council member, he is responsible for representing tribal members, obtaining government grants, enforcing the rules, and educating the public about tribal court codes and other laws.

Bald eagle permits may be obtained through the Fish and Wildlife Service, but there was no educational process.  The tribal council gave information about the permit application process but did not ever inform the tribe at large or through a forum that an eagle needed to be registered if it was on tribal land, or how to properly register an eagle.  Nor did Mike Tyndall, the wildlife ranger for the Omaha Tribe, take steps to inform the public about eagle permits.

Morris acknowledged on cross-examination that the tribal laws indicate that it is a federal offense to take eagles, it was against the law to kill eagles, and the defendant (who is Morris' nephew) probably knew at the time that it was against the law to kill eagles.  Morris inherited his own feathers from his uncle.  He was aware that there is a permit process through the Fish and Wildlife Service and that there is a process in his religion about how to handle parts of an eagle.

Morris testified that Shane Bertucci is a member of the Omaha Tribe and that they are both members of Native American Church.  Morris, who is a road man or spiritual leader in the church, often asks Bertucci to assist him with  prayer meetings.  Bertucci has been a member of the church for about 15 years.

Mr. Morris testified that they use bald eagle feathers to pray. Morris described the ceremonial uses of eagle feathers and the eagle bone whistle. Each service is unique and lasts up to 10 hours. The tradition has been passed down through the generations and use of the eagle is essential for communication with the creator, Waconda.

According to Mr. Morris, membership in the Native American Church consists of one's degree of Indian blood. Only members of the church possess a membership card. His own card had expired, but other members did have cards. The national organization, the Native American Church of North America, also issues membership cards. The membership card states that the holder may utilize the medicine (peyote) and can carry the feathers (scissor tails and parts of the migratory birds). The issuance of membership cards through the Native American Church of the Omaha tribe allows the tribe to keep track of who may purchase the medicine when they're asked to, or sponsor meetings. They carry membership cards in case they are stopped by the police while in possession of a peyote box, other medicines, or feathers and plumage. The cards do not advise that the holder, as a member of the Native American Church, is allowed to kill eagles or sell or trade eagle feathers. Those activities would not be consistent with religious practice.

Morris testified that Bertucci did not talk to him about the eagles that he took in 2005 and 2006, and Morris did not know that Bertucci had killed the eagles until about 2008. Morris knew it was against federal law, but they were a sovereign nation. He believed Bertucci could have been prosecuted in the tribal court, but it might make a difference to the tribal court whether the birds were taken for religious use or for money. There a religious procedure for killing a bald eagle: put tobacco down and pray for a good thing or good intentions, because the feathers or plumes are going to be used in a good way.

-4-

The significance of the eagle feather in Morris' religion is as a protector. An eagle feather also assists in the ability to communicate with Waconda, the creator; however, if you don't have an eagle feather you could use probably a migratory bird part feather. Morris, who attends the Catholic Church as well as the Native American Church, analogized the use of feathers and peyote in the Native American Church to the Eucharist practiced in the Catholic Church. He acknowledged that there was a permit process for obtaining migratory bird feathers, and it would not be a violation of his religion to participate in the permit process.

In 2007, Mike Tyndall of Fish and Wildlife advised Morris that it would take three-and-a-half to four years to obtain an eagle part from the government's repository. Tribal members who have obtained items from the repository have reported that the feathers and bird parts are deteriorating or decayed. His religion had no purity requirement, but the items would smell of decay.

Morris testified on redirect that he was aware of religious ceremonies that require the presentation of a fan or a plume of feathers by a parent to a child when the child is about four years old. It is a high honor to receive an eagle feather. The feathers are sacred items, not play toys. After the ceremony, the feathers are put away until they can be used in the next ceremony.

## 2. Testimony of Jeffrey Gilpin (Filing 35, pp. 44-75)

Jeffrey Gilpin has been a prayer leader in the Native American Church since 1989 and has been on the Omaha Nation Tribal Council since November 5, 2008. He testified that defendant Bertucci was a grandson according to traditional ways, and that Bertucci had assisted him in prayer services. In 2006 and 2007, he was aware of the procedure for registering eagle feathers. That type of information was disseminated by word of mouth. The wildlife director, Mike Tyndall, was not making permit applications or any such information available to the public.

Mr. Gilpin described religious ceremonies of the Native American Church and Shane Bertucci's role in assisting him in the ceremonies. He testified that eagle parts and eagle feathers are sacred items in his religion, so sacred that his people do not want them touching the ground. Such items are generally handed down and are important as a protector, somewhat like the use of the cross in the Catholic Church to confront the devil. Children are presented with a feather, plume or tail fan during the annual powwow. Mr. Gilpin testified regarding the origin of the powwow and explained that the children are brought into the arena and given their plumes and dancing regalia. It is a sacred use of the plumes, which are a protector for the little ones. The children are entitled to the eagle parts or feathers from the time they are born. Although it is desirable to present the feathers to the children as soon as possible–as soon as they can walk–there is no age limit by which the presentation must be made.

Gilpin became aware that Shane Bertucci had killed bald eagles after it was made known to the public. Bertucci did not discuss the matter with Gilpin. In his religion, a person taking an eagle must take the tobacco and make a prayer for it, telling the creator what the eagle will be used for. He opined that defendant Bertucci was not hiding behind religion to deal with the killing of the bald eagle.

On cross-examination, Mr. Gilpin testified he was not aware that there is a law in the Omaha Tribe forbidding the killing of eagles because it is a violation of federal law. The feathers he uses were handed down to him from his father, who had been given the feathers by his father-in-law. The instruments that he uses came to his family in 1906. It is acceptable in his religion to kill eagles for a specific purpose such as plumes for the children or for the regalias they use; it is not acceptable to "kill them just for the heck of it." It is not a religious practice to sell eagles for money or to trade

-6-

them for substances such as marijuana.  Nor does his religion prohibit participating with the federal government in order to obtain eagle parts or eagle feathers.

Mr. Gilpin testified on redirect that there are problems with using items obtained from the federal repository.  He got an eagle through the repository in about 1985.  The right wing was good, but the other wing was shot.  The tail feathers were bent and unusable.  The appearance of the feathers did not affect the quality of prayer, but they were not presentable in public.

### 3. Testimony of Shane Bertucci (Filing 35, pp. 76-92)

The defendant, Shane Bertucci, is a member of the Omaha Tribe and is a member of the Native American Church.  His church membership card provides that he can possess "peyote, eagle feathers and migrating birds, scissor tails."  Bertucci acknowledged that he had been told he was not allowed to possess eagle feathers or eagle parts without a permit.  Bertucci admits that he killed the eagles as alleged in the indictment.  He testified he was not told that he could not shoot the eagles without a permit and thought he was entitled to kill the eagles for religious purposes.

Bertucci testified he took the eagles for use in a feathering ceremony for his children, which he wished to complete while his grandfather was still living.  He made a prayer to God, or Waconda, for them.  "And he made it possible for me.  And ... I gave him thanks for it[.]"  He wanted his children to have good feathers, not feathers that you find on the side of the road.  He wanted the feathers to be presentable, in good shape and nice.

Bertucci testified he made an offering to God by putting tobacco down.  He prayed first with the tobacco, asking God for what he wanted.  When he took the bird from the wild, he put tobacco down where it laid.  He then took the bird, held it in his hands and prayed again, telling God where those feathers were going to go and what he was going to use them for.  That was the commitment

-7-

he made with God for them.  When he finished, he dug a shallow grave, put tobacco down, and buried the parts of the eagle he was not going to use.  He did not discard any eagle parts, sell them, trade them for drugs, or disrespect the bald eagle.  His sole intention was to use the eagles for a religious ceremony.  He stated on cross-examination that he did give some eagle parts to other individuals for their religious use.

Bertucci testified he did not know about the eagle repository prior to his conversation with Agent Webb.  After that time, he made efforts to lawfully possess eagle feathers for his ceremony by making permit applications.  Based on the information printed on the permit applications, and friends' experiences, it will take three to four years to procure eagle parts through the permit process.

### B.  Government's Evidence

#### 1.  Testimony of Mark Allen Webb (Filing 44, pp. 4-42)

Mark Allen Webb is a special agent for the United States Fish and Wildlife Service.  At the time of the acts alleged in the indictment, Webb was stationed in Lincoln, Nebraska and assigned to enforce federal wildlife laws.  His enforcement area included cover the Omaha Indian Reservation in Macy, Nebraska.

Webb testified that he received training regarding the Bald and Gold Eagle Protection Act and is aware of the exception to the ban on the taking of eagles by Indian tribal members for religious purposes.  He is also familiar with the permit process.  While he was stationed in Lincoln, Webb received about 20 requests for permits each year from  Native American tribal members.

Exhibit 102 is the initial permit application form.  A Native American who belonged to a federally-recognized tribe would complete this form in order to request eagle carcasses or eagle feathers from the National Eagle Repository located near Denver, Colorado.  There is no fee for the

permitting process.  The forms are available through any regional fish and wildlife office, from any of the approximately 200 fish and wildlife agents stationed throughout the United States, and online on the fish and wildlife website.  The permits do not expire.  Exhibit 103 is a re-order request form, to be used if the individual has utilized the feathers that were sent him from the original request and wants to request additional feathers.

According to Agent Webb, there is no overall limit on the amount of eagle parts a tribal member can receive; however, due to the huge demand and limited supply, an individual may not submit more than one application at a time that would include parts of more than one eagle.  For example, an applicant cannot request a whole carcass and then request wings or tails on another application, but they could request an order of 10 loose feathers, and then another request of 20 loose feathers, or of wings only, or skulls, or talons, so long as the combined parts did not equal more than one complete carcass.

Webb, who is now stationed in Denver near the national repository, testified that the repository refuses to send out spoiled or extremely damaged feathers.  He acknowledged that some of the feathers would have a strong odor because they came from carcasses that may have been laying out in the wild dead for some time.  The repository does not clean feathers, but does pluck them from the carcasses to fulfill specific orders.  Feathers that are heavily damaged or rotten or spoiled are incinerated.

Webb testified that the permitting process exists because the demand for eagle feathers by Native Americans far exceeds the available population of eagles. If the unrestricted killing of eagles were allowed, eagles themselves could become an extinct species because of the huge demand for the feathers.  Webb was not aware of any other method of supplying eagle feathers to Native

Americans that would not be detrimental to the population of eagles within the United States.  He acknowledged that bald eagles were removed from the endangered species list as of August 2007.

According to Agent Webb, a tribal member would have to wait between 90 days and six months for a mixed delivery of feathers or plumes from the repository.  A plume consists of the small fluffy feathers found underneath the tail of an eagle.  It could take up to four years to supply a full carcass of an immature golden eagle.  As for specific eagle parts, the waiting time runs anywhere from one year to four years, depending specifically on what body part is requested, whether it is from a golden or a bald eagle, and whether the bird was an immature or a mature bird. The longest waiting period is for immature golden eagles.  He testified on cross-examination that he did not know how many people were on the waiting list.

On March 27, 2007, Agent Webb received a phone call from Mike Tyndall,  the tribal game warden on the Omaha Indian Reservation at Macy, reporting that they had discovered seven eagle carcasses, a falcon and some hawk carcasses that had been placed in plastic bags after having their heads, wings and tails removed.  The bags were placed or dumped along the Missouri River on the Omaha Reservation just outside of the town of Macy.  Webb began his investigation the following day and interviewed the defendant, Shane Bertucci.

Agent Webb testified that he did not know Shane Bertucci prior to this incident. He happened to be in the parking lot of the Omaha tribal police department when Bertucci drove through the parking lot and was pointed out to Webb.  Webb waved him down and asked if he would be willing to talk.  Bertucci agreed, so the interview took place at the Omaha tribal police department in Macy. Bertucci produced his enrollment card showing that he was an enrolled member of the Omaha Tribe.

-10-

According to Webb, Bertucci waived his *Miranda* rights and admitted shooting three different eagles.  Bertucci told Webb that he gave one whole carcass to Mr. Quentin Dick; gave the wings from another carcass to one Mark Merrick; and still possessed the tail fans or the 12 primary tail feathers from the two carcasses that he had retained.  He also had another set of wings that he had placed in storage at Quentin Dick's for safekeeping.  Bertucci also admitted shooting between two and five hawks during 2006-2007 and that he sold 12 tail feathers off of a red-tailed hawk for $100.

The interview lasted between 60 and 90 minutes.  Agent Webb stated that Shane Bertucci did not explain during the interview that he shot the eagles for religious purposes or to get feathers for his children for a tribal ceremony.  Nor did Bertucci mention during the interview that he had tried using the legal process to procure eagle feathers; at some point of the interview, however, Bertucci did advise that he was familiar that a permit was required to possess eagles.  Bertucci did tell Agent Webb that the tail fans from two of the eagles were in his cedar peyote box, which would be traditionally where many traditional Native American Church members keep feathers that they use for religious purposes.  In that sense,  the conversation did have some "religious overture." Webb did not recall any conversation about exactly how Bertucci was planning on using the immature and the mature bald eagle tail fans that he had in his possession.

The eagle feathers and peyote box were being kept at a brother's home and were seized at that location. Bertucci's peyote box contained the 12 tail feathers from an immature bald eagle, a mature bald eagle, 12 red-tailed hawk feathers, 42 covert feathers, two other partial tail feathers from both immature and mature bald eagles, and some Mexican eagle feathers that are not protected by U.S.

-11-

law.  There were parts there of at least three different eagles in the peyote box.  Bertucci did not have any plumes in his possession.

Bertucci told Agent Webb that he had removed the wings and tails of the birds and buried the remaining carcasses, i.e., all the body feathers, plumes underneath the tail, talons, and skull. Webb did not retrieve the buried carcasses but did recover the carcass that Bertucci gave Quentin Dick after Mr. Dick threw it off a bridge.

### C.  Rebuttal Testimony of Shane Bertucci (Filing 44, pp. 42-45)

Defendant Bertucci testified on rebuttal that he did show Agent Webb his Native American Church card and did discuss his Native American beliefs with Agent Webb during the interview to let Webb know that he was not shooting birds for profit; he was doing it for religious purposes.  He explained to Agent Webb that the tails were for his children and the wings were going to Bertucci's uncle because he needed them.  Bertucci stated he did not provide Webb with the buried carcasses because he did not want to disturb them.

### III.  LAW

In this instance, the defendant did not apply for a permit and, therefore, lacks standing to assert an "as applied" First Amendment free exercise of religion defense.  *See United States v. Tawahongva*, 456 F. Supp. 2d 1120, 1127 (D. Ariz. 2006).  The issues presented involve only the application of the RFRA.  The history, objectives and application of the RFRA were recently discussed by the U.S. Supreme Court in  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006):

> In *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, (1990), this Court held that the Free Exercise Clause of the First Amendment does not prohibit governments from burdening religious practices through generally

applicable laws.  In *Smith*, we rejected a challenge to an Oregon statute that denied unemployment benefits to drug users, including Native Americans engaged in the sacramental use of peyote.  *Id.*, at 890.  In so doing, we rejected the interpretation of the Free Exercise Clause announced in *Sherbert v. Verner*, 374 U.S. 398 (1963), and, in accord with earlier cases, *see Smith*, 494 U.S., at 879-880, 884-885, held that the Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws.  *Id.*, at 883-890.

Congress responded by enacting the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, as amended, 42 U.S.C. § 2000bb *et seq.,* which adopts a statutory rule comparable to the constitutional rule rejected in *Smith*.  Under RFRA, the Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, "even if the burden results from a rule of general applicability." § 2000bb-1(a).  The only exception recognized by the statute requires the Government to satisfy the compelling interest test – to "demonstrat[e] that application of the burden to the person– (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb-1(b).  A person whose religious practices are burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief." § 2000bb-1(c).

546 U.S. at 424 (parallel citations omitted).

In this case, the defendant bears the initial burden of establishing that his personal free exercise of his religion was substantially burdened by the Eagle Act.  In this regard, the defendant must establish that his possession of the eagles was for his own personal, as opposed to commercial, use.  The defendant must also show that the burden on his free exercise of his religion is "substantial," rather than a mere inconvenience.  *United States v. Tawahongva*, 456 F. Supp. 2d 1120, 1131 (D. Ariz. 2006).  In order to be considered a "substantial" burden, the governmental action must significantly inhibit or constrain conduct or expression that manifests a central tenet of an individual's religious beliefs; must meaningfully curtail the individual's ability to express adherence to his or her faith; or must deny an individual reasonable opportunities to engage in

-13-

activities that are fundamental to the person's religion. *United States v. Oliver*, 2000 WL 34030990 at **2-3.

The court is persuaded that Shane Bertucci's possession of the eagles was for his own personal, as opposed to commercial, use. Based on the various witnesses' testimony, the court is not persuaded that the burden placed by the Eagle Act on Bertucci's free exercise of his religion is "substantial" in this instance.

Eagle parts and eagle feathers are sacred items in Bertucci's religion, and it is clear that Bertucci took the three eagles so that they could be used for religious purposes. The use of eagles is central to Bertucci's religious beliefs, but it does not appear that enforcement of the Eagle Act in this instance would curtail Bertucci's ability to express adherence to his faith or deny him reasonable opportunities to engage in activities that are fundamental to his religion.

The conduct or expression of religious beliefs asserted in this case is that Bertucci wanted to use the eagle feathers and parts in a feathering ceremony for his children and hoped to do so while his grandfather was still alive. The court accepts that explanation; however, Bertucci's religion does not require that the feathering ceremony be performed by any particular time or deadline. The feathering ceremony, as described by the witnesses, does not require the use of any specific part of the eagle; a feather would be sufficient. A tribal member would have to wait between 90 days and six months for a mixed delivery of feathers or plumes from the repository. The delay is an inconvenience, but would not deny Mr. Bertucci a reasonable opportunity to engage in the religious ceremony that he has designated. The court also notes the witnesses' valid concerns about the quality of the items obtainable from the repository, but there is no evidence of a "purity" requirement in this

-14-

instance, and no evidence suggesting that the act of participating in the permit process would violate Bertucci's religion.

Should the district court determine that the defendant has met his burden of showing that his personal free exercise of his religion was substantially burdened by the Eagle Act, the RFRA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'–the particular claimant whose sincere exercise of religion is being substantially burdened." *Smith*, 546 U.S. at 430-31 (citing 42 U.S.C. § 2000bb-1(b)).   Assuming that enforcement of the Eagle Act in this instance would substantially burden the defendant's personal free exercise of his religion, the court finds the government has shown that the permitting process is the least restrictive means of furthering the compelling government interest in preserving eagles as a species in this country.  There is no fee charged for submitting an application for a permit. Permits, once issued, do not expire and  there is no overall limit on the amount of eagle parts a tribal member can receive.  The permit forms and instructions are readily available from numerous sources.  The fact that the bald eagle is no longer listed as an endangered species does not, as a matter of law, establish that the government's interest in protecting this species is less than compelling.  *See United States v. Tawahongva*, 456 F. Supp. 2d  at 1133. The Eighth Circuit has recognized that "unrestricted access to bald eagles would destroy legitimate and conscientious eagle population conservation goal" of the Eagle Act and that the permit process is the least restrictive method available for preserving and protecting the eagle population while not unreasonably restricting the religious freedom of the defendant.  *United States v. Oliver*, 255 F.3d at 589; *United States v. Oliver*, 2000 WL 34030990 at *7.

-15-

Assuming that the defendant is substantially burdened in his free exercise of religion, the government has a compelling interest in preserving the eagle population. The court finds no reason to depart from the finding in *United States v. Oliver* that government is employing the least restrictive means to advance the government's compelling interest.

## IV.  RECOMMENDATION

**IT IS RECOMMENDED** that the defendant's Motion to Dismiss (Filing 23) be denied.

Any objections to this Recommendation must be filed within 14 days of the date of this Report and Recommendation.

**DATED November 25, 2009.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-16-